1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

9  JESSE VEGA,                                   CASE NO. 1:09-cv-00735-SMS

10                         Plaintiff,
                                                ORDER AFFIRMING AGENCY'S
11        v.                                    DENIAL OF BENEFITS

12  MICHAEL ASTRUE,
    Commissioner of Social Security,
13
                          Defendant.
14  _____/

15

16

17        Plaintiff Jesse Vega, proceeding *in forma pauperis*, by his attorney, Law Offices of

18  Lawrence D. Rohlfing, seeks judicial review of a final decision of the Commissioner of Social

19  Security ("Commissioner") denying his application for supplemental security income  ("SSI"),

20  pursuant to Title XVI of the Social Security Act (42 U.S.C. § 301 *et seq.)* (the "Act").  The

21  matter is currently before the Court on the parties' cross-briefs, which were submitted, without

22  oral argument, to the Honorable Sandra M. Snyder, United States Magistrate Judge.[1]  Following

23  a review of the complete record and applicable law, the Court concludes that the ALJ properly

24  found Plaintiff ineligible for benefits.

25  ///

26  ///

27  ///

28

---

[1]  Both parties consented to the jurisdiction of a United States Magistrate Judge (Docs. 8 & 10).

1    I.    **Administrative Record**

2         A.    **Procedural History**

3         On June 1, 2003, Plaintiff filed for supplementary security income, alleging disability

4    beginning June 1, 1998.[2]  AR 68.  His claim was initially denied on December 26, 2003, and upon

5    reconsideration, on September 21, 2004.  AR 68.  On November 15, 2004, Plaintiff filed a timely

6    request for a hearing.  AR 68.   Plaintiff appeared and testified at a hearing on May 17, 2006.[3]  AR

7    565-600.  On September 14, 2006, Administrative Law Judge Bert C. Hoffman, Jr., denied

8    Plaintiff's application.  AR 68-74.  Thereafter, the Appeals Council remanded the matter for

9    further evaluation of Plaintiff's mental impairment.  AR 19.  An additional hearing took place on

10   March 25, 2008.  AR 527-564.  On July 24, 2008, the ALJ again denied Plaintiff's application.

11   AR 19-25.  The Appeals Council denied review on March 11, 2009.  AR 10-12.   On April 23,

12   2009, Plaintiff filed a complaint seeking this Court's review (Doc. 1).

13        B.    **Factual Background**

14        In 1972, Plaintiff (born March 3, 1953) graduated from Pershing High School, where he

15   attended special education classes.[4]  AR 170.  Plaintiff has experienced fatigue since 1967, when

16   he was sixteen years old.  AR 215.  His asthma is exacerbated by lawn mowing, car exhaust,

17   exertion, and heat.  AR 215.

18        In the 1970's and 1980's, Plaintiff was a construction laborer, measuring manholes,

19   digging potholes to locate utility lines and water pipes, and carrying bags of cement.  AR 165,

20   210.

21        Plaintiff speaks English but cannot read or write it.  AR 163.  Accordingly, Plaintiff cannot

22   follow written instructions. AR 181.  At an agency interview in 2003, Plaintiff demonstrated

23

24        [2] Plaintiff had filed multiple prior SSI applications.  Materials from prior applications were included within
     the record for this application.  Although the Court reviewed the complete record in this case, not all materials
25   incorporated from prior applications have been explicitly recounted in this decision.

26        [3] An additional hearing was convened on January 12, 2006, but was adjourned without testimony being
     taken to permit Plaintiff to secure the services of an attorney.  AR 601-612.

27        [4] Examining Plaintiff for the agency in 1997, in the course of one of Plaintiff's earlier applications for SSI,
28   testing administered by  Gregory Butler, Ph.D., indicated that Plaintiff's intellectual functioning was borderline
     (verbal IQ=72; performance IQ=84; full scale IQ=77).  *See* AR 462.

1  difficulty with reading, writing, and sitting.[5]  AR 174.  Plaintiff also has occasional difficulty
2  following verbal instructions.  AR 181.

3         At an agency interview in 2001, Plaintiff had difficulty breathing and used an inhaler
4  several times.  AR 206.  His eyes were yellow, and he appeared jaundiced.  AR 206.

5         In a daily activities questionnaire, Plaintiff reported that asthma limited his daily activities.
6  AR 177.  He had difficulty sleeping because of anxiety attacks.  AR 177.  Because his hands
7  swelled while he slept, he was sometimes unable to care for his personal needs in the morning.
8  AR 177.

9         Plaintiff cooked his own meals with help from his sister, who brought him prepared meals
10  to heat.  AR 178.  His sister also shopped for him.  AR 178.  He was able do household cleaning,
11  laundry, and ironing.  AR 178.  Plaintiffs sister came three times a week; he spoke with family by
12  phone daily.  AR 180.

13         Plaintiff enjoyed making model cars and restoring antique furniture.  AR 178.  He also
14  enjoyed watching television alone or with his granddaughter.  AR 179.  Plaintiff cared fully for his
15  two dogs.

16         Plaintiff went out of his home twice a week, traveling by foot or bus, usually going to see
17  the doctor.  AR 179.  Because of his asthma, he experienced shortness of breath on long walks.
18  AR 180.

19         Plaintiff's anxiety impaired his concentration and led him to be easily annoyed by others.
20  AR 180, 181.

21         The report of Plaintiff's friend, Henrietta Gonzales,[6] largely repeated the information on
22  Plaintiff's daily activities report.  AR 188.  Gonzales confirmed that Plaintiff had difficulties
23  meeting his personal needs when his hands were swollen.  AR 184.  She added that he enjoyed
24  working on landscaping projects.  AR 185.  Many activities aggravated Plaintiff's asthma,
25  rendering him short of breath.  AR 187.  Some of his medications made him drowsy, and Plaintiff

26

27         [5] Plaintiff rose from his chair and stretched several times during the thirty minute interview.

28         [6] Gonzales had helped Plaintiff, who cannot read or write English, complete his written activities report.

3

1  was not always aware that his medications sometimes affected his thinking.  AR 187.  Gonzales

2  reported that, because Plaintiff had rheumatic fever as a child, he continued to experience aching

3  and swelling of his joints.  AR 188.

4          In 2001, Plaintiff reported experiencing an asthma attack about once a week.  AR 190.  He

5  had previously been taken to the emergency room for treatment of an asthma attack, and once

6  spent two days ion Fresno Community Hospital.  AR 190, 191.  Plaintiff has experienced both

7  asthma and repercussions from rheumatic fever since childhood.  AR 191.

8          In response to an agency inquiry on December 24, 2003, Plaintiff stated that his mental

9  disorder was controlled with medication and that he was not being treated by a psychiatrist or

10 psychologist.  AR 338.

11         **S. Damania Psychiatric Evaluation (January 9, 2002).**  Shireen R. Damania, M.D.,

12 conducted a psychiatric evaluation of Plaintiff for the agency.  AR 242-245.  Plaintiff was the sole

13 source of background information and reported that his medical problems included asthma, a heart

14 murmur, and hepatitis A, B, and C. AR 242.  His medications included ibuprofen, Xanax, aspirin,

15 and Tylenol with codeine.  AR 242.  He also took methadone, having ended intravenous drug

16 abuse of heroin and cocaine five or six years earlier.  AR 242.  Plaintiff initially denied smoking

17 and drinking alcohol, but later disclosed that he occasionally drank beer and had abused alcohol as

18 "a teenager."  AR 242-243.  Damania described Plaintiff's accounts of his alcohol use as "evasive

19 and guarded."  AR 243.

20         Plaintiff related that in the past, he had been "in and out of jail," but had not been

21 incarcerated since 1991.  AR 243.  He lived with his mother, his twenty-year-old daughter, and

22 two-year-old granddaughter.  AR 243.  Plaintiff previously worked in construction but had not

23 been employed since the mid-1980's.  AR 243.

24         Damania diagnosed:

25    Axis I      1.    Alcohol dependence, unspecified, 303.90 in partial remission, by
                        history.
26                2.    Polysubstance abuse, unspecified, 304.80 in remission five years, by
                        history.
27                3.    Adjustment disorder, with anxious mood. 309.24.

28    Axis II    Personality disorder, not otherwise specified.  301.9

| | | |
|---|---|---|
| Axis III | 1. | hepatitis A, B, and C, by history only. |
| | 2. | Bronchial asthma, by history. |
| Axis IV | Level of psychosocial stressors – Mild. (Unemployed.) | |
| Axis V | GAF current – 55.     Highest past year – 42. | |

AR 244.

Damania further summarized:

> The claimant was neatly dressed and groomed, pleasant, appropriate, cooperative, with adequate interpersonal and social skills. No difficulties were noted in memory, either recent or remote, concentration, persistence, and pace. There is no evidence of any emotional lability. He is able to understand, carry out, and remember simple, as well as one and two step job instructions. He is able to respond appropriately to co-workers, supervisors, and the public. He is able to respond appropriately to usual work situations, and deal with changes in a routine work setting, if the instructions are presented simply and undimensionally.

AR 244.

**R. Damania Physical Evaluation (January 9, 2002).** Plaintiff complained of body pain and night sweats to Rustom Damania, M.D., who prepared a medical evaluation for the agency. AR 247. Again, medical history was acquired solely from Plaintiff's accounts. AR 247. Plaintiff had bronchial asthma, which was treated with a nebulizer. AR 247. He had never been hospitalized for asthma and had one emergency room visit in the past year. AR 247. Plaintiff was not dependent on oxygen or steroids. AR 247. According to laboratory tests reported to Plaintiff, he had hepatitis A, B, and C. AR 247. Plaintiff's mother informed him that he had a heart murmur, but he had no cardiac symptoms. AR 247.

Medications included Tylenol with codeine, Xanax, aspirin, methadone, and albuterol and Azmacort inhalers. AR 248. Plaintiff denied alcohol use and reported that he had stopped smoking two years earlier. AR 248. Plaintiff denied a history of psychiatric problems. AR 248.

Damania diagnosed bronchial asthma (by history); hepatitis A, B, and C (by history); vague arthralgias of undetermined origin; prior intravenous heroin use, now maintained on methadone; rule out thyrotoxicosis. AR 250. Damania found no clinical evidence of cardiac problems. AR 250. His assessment was:

> The patient is a 48-year-old male who appears to be well-oriented to time, place and person. He answers questions. On gross clinical exam I did not observe any

5

gross mental impairments.  I did not observe or find any objective evidence for gross physical disability.  Because of his severe diaphoresis at night and fine tremors of the hands, I recommend that he return to the clinic and have some thyroid function tests done.

Otherwise, the patient is ambulatory and does not require an assistive device to ambulate.  I did not find any gross exertional limitations.  No postural limitations with bending, stooping or crouching.  No manipulative limitations with reaching, handling, feeling, grasping, or fingering.  No relevant visual or communicative impairments.

AR 250.

**Middleton's Assessments for Agency (March 12, 2002).**  Performing the psychiatric review technique for the agency, Allen Middleton, Ph.D., noted anxiety-related disorders (adjustment disorder), personality disorders (indescipherable), and substance addiction disorders (alcohol dependence in remission).  AR 253-256.  He found mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace.  AR 257.  He did not evaluate episodes of decompensation due to insufficient evidence.  AR 257.

Middleton's assessment of Plaintiff's residual functional capacity found no significant limitations except that Middleton rated Plaintiff's ability to understand and remember detailed instructions and his ability to carry out detailed instructions as ranging from not significantly limited to moderately limited.  AR 259.

**Murillo's review.**  Evangeline Murillo, M.D., performed a psychiatric review technique for the agency on December 24, 2003.  AR321.  She found no medically determinable impairment.  AR 321.

**2003 RFC Assessment.**  On November 17, 2003, Ernest Wong prepared an RFC analysis for the agency in which he concluded that Plaintiff had no limitations other than avoidance of fumes and odors.  AR 322-329.

**Valley Health Resources Assessments.**  On October 21, 2003, Naeemah H. Ghafur, M.D., prepared an assessment for the agency in which he found "no objective findings on which to base restriction of this patient's physical activities."  AR 286-290.

///

1    On May 28, 2008, Dr. Rustom Damania prepared an assessment for the agency in which

2    he reported no functional limitations.  AR 348-352.  Damania opined that Plaintiff could lift fifty

3    pounds occasionally and twenty-five pounds frequently.  AR 352.

4    **Hijazi Records.**  Records of medical treatment by Plaintiff's primary care physician, Saad

5    Hijazi, M.D., are included in the record at AR 281-285, 342-347.

6    On May 6, 2003, Plaintiff was treated for anxiety resulting from his methadone

7    withdrawal.  AR 285.  By May 27, 2003, Plaintiff was also experiencing associated sleep

8    problems.  AR 285.

9    In a statement to Fresno County Child Support Services dated June 26, 2003, Hijazi noted

10   that Plaintiff was permanently disabled as a result of body ache and back pain attributable to his

11   history of rheumatic fever; depression and anxiety disorder; and chronic fatigue syndrome.  AR

12   283.

13   On July 24, 2003, Hijazi provided a conclusory assessment that Plaintiff was disabled on a

14   prescription blank.  AR 281.  On that date, Plaintiff complained of increased shortness of breath,

15   which Hijazi attributed to acute exacerbation of Plaintiff's asthma.  AR 282.  Hijazi also noted an

16   intent to taper the Valium prescribed for Plaintiff's anxiety.  AR 282.

17   **University Medical Center Records (AR 297-320).**  In or about April 2004, Plaintiff had

18   surgery at University Medical Center to treat a scrotal abscess.  On July 19, 2004, an

19   echocardiogram found Plaintiff to have normal left ventricle systolic function and size.  AR 297.

20   **Residual Functional Capacity Assessment.**  A RFC assessment completed February 23,

21   2002, by an agency medical consultant found that Plaintiff had no limitations except for a need to

22   avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation.  AR262-269.

23   **Childhood Medical Records.**  Medical records from Plaintiff's childhood are included in

24   the record at AR 355-447.  Among other things, these records reflect that Plaintiff was first

25   diagnosed with asthma in childhood and that he experienced frequent joint pain, particularly in his

26   knees.

27   ///

28   ///

**St. Agnes testing.** Tests performed at St. Agnes Medical Center on November 16, 1997, confirmed that Plaintiff had an abnormally high Rheumatoid factor as well as elevated liver enzymes. AR 496.

**Plaintiff's testimony (May 17, 2006).** Plaintiff has not had a driver's license since 1972, when it was revoked for nonpayment of child support. AR 572-573. Plaintiff testified that he did not need a license since has no car and travels by bus. AR 573. In addition to a high school diploma, Plaintiff attended, but did not complete, a two-year course at City College in body and fender work. AR 573.

Plaintiff had not worked in the past fifteen years. AR 574. He testified that no one would hire someone with asthma and back problems, but admitted that he had not tried to find work. AR 576.

Plaintiff had asthma, back pain, arthritis in his hands, and Hepatitis C. AR 576-577, 587-588. He had not been treated for either arthritis or hepatitis; in fact, he had no symptoms of hepatitis that he knew of. AR 577. Because he always felt tired, Plaintiff napped for one hour around lunchtime and slept about eleven hours each night. AR 585-586.

Plaintiff was allergic to the lawn, cats, and cleaning solvents, and was sensitive to extreme temperatures. AR 584-585. He treated himself for shortness of breath nearly every day, either with an inhaler or a nebulizer. AR 577-578. Typically, if Plaintiff found himself short of breath, he would first try a shot of inhaler, followed by a second shot. AR 579-580. If that did not relieve his breathlessness, he would then use the nebulizer for two or three minutes. AR 580. Plaintiff generally needed to use the nebulizer about twice a week. AR 583. After using the nebulizer, he generally regained normal breathing but felt shaky and had to rest for about one-half hour. AR 580-581. If home treatment was unsuccessful, Plaintiff had to go to an emergency room. AR 581. He last needed emergency treatment six or more months earlier. AR 581.

Plaintiff was able to perform his own personal care and to cook for himself. AR 586-587. He cleaned the inside of his home. AR 592-594. He was able to concentrate well. AR 599.

**Plaintiff's testimony (March 25, 2008).** By the time Plaintiff testified at the administrative hearing on March 25, 2008, he lived alone in the family home, which was owned

1   by his sister.  AR 532.  He had lost medical benefits during his daughter's tenure in the house and

2   had not regained them.  AR 533-534.  As a result, he tried to visit Dr. Hijazi only when care was

3   absolutely necessary.  AR 534.  Hijazi continued to prescribe drugs for Plaintiff's asthma and

4   depression, including the nebulizer, inhalers, and Valium.  AR 536-537.  Plaintiff used the

5   nebulizer more often than previously, since the inhalers did not relieve his symptoms.  AR 537-

6   539.  Plaintiff described his depression as an inability to tolerate others for more than a short time.

7   AR 554.  When others got on his nerves, he told them he did not feel well and went inside.  AR

8   554-555.  He had suicidal thoughts which lasted fifteen or twenty minutes until he could get his

9   mind off suicide by watching televison..  AR 557.

10        Plaintiff also complained of fatigue, difficulty sleeping, and pain in his hands and lower

11   back.  AR 540-542. Hijazi prescribed Valium to alleviate the back pain.  AR 545.  Plaintiff had

12   not had any other treatment of his back problems because he was unable to afford it.  AR 536.

13   Plaintiff treated the pain in his hands by wearing special gloves that his son had brought him.  AR

14   551.  He was unable to lift more than a cup of coffee without experiencing great pain from his

15   arthritis.  AR 551-552.  Plaintiff had given up his hobby of making model cars because he could

16   not get them to go together.  AR 556.  He spent his time watching western movies on television.

17   AR 556-557.

18        Plaintiff's sister traveled to Fresno daily from Avenal to care for him.  AR 549.  She did

19   his laundry because he did not know how to operate the machine.  AR 544.  His sister also

20   cleaned the house because of Plaintiff's sensitivity to cleaning products.  AR 543, 545.  Plaintiff

21   cooked soft-boiled eggs, sandwiches and TV dinners for himself.  AR 548.  His sister shopped for

22   him, using his food stamps.  AR 548.  Plaintiff was afraid that he would get dizzy or faint if he

23   shopped.

24   **II.**   **Discussion**

25        **A.**   **Legal Standards**

26        To qualify for benefits, a claimant must establish that he or she is unable to engage in

27   substantial gainful activity because of a medically determinable physical or mental impairment

28   which has lasted or can be expected to last for a continuous period of not less than twelve months.

9

42 U.S.C. § 1382c (a)(3)(A).  A claimant must demonstrate a physical or mental impairment of such severity that he or she is not only unable to do his or her previous work, but cannot, considering age, education, and work experience, engage in any other substantial gainful work existing in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

To encourage uniformity in decision making, the Commissioner has promulgated regulations prescribing a five-step sequential process for evaluating an alleged disability.  20 C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f).  The process requires consideration of the following questions:

| | |
|---|---|
| Step one: | Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two. |
| Step two: | Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate. |
| Step three: | Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four. |
| Step four: | Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five. |
| Step five: | Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled. |

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since June 1, 2003.  AR 21.  Asthma was Plaintiff's single severe impairment.  AR 21.  His impairment did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpt. P. Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925, and 416.926).  AR 23.  Plaintiff had no past relevant work. AR 24.  Plaintiff had the residual functional capacity to perform the full range of medium work. AR 24.  After considering Plaintiff's age, education, work experience, and residual functional capacity, the ALJ concluded that unskilled jobs that Plaintiff could perform existed in the national economy in significant numbers.  AR 24.

///

///

1  **B.    Scope of Review**

2  Congress has provided a limited scope of judicial review of the Commissioner's decision

3  to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations,

4  a court must determine whether substantial evidence supports the Commissioner's decision.  42

5  U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*,

6  402 U.S. 389, 402 (1971)), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d

7  1112, 1119 n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept

8  as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401.  The record as a whole must

9  be considered, weighing both the evidence that supports and the evidence that detracts from the

10  Commissioner's decision.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the

11  evidence and making findings, the Commissioner must apply the proper legal standards.  *See, e.g.,*

12  *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the ALJ's

13  determination that the claimant is not disabled if the ALJ applied the proper legal standards, and if

14  the ALJ's findings are supported by substantial evidence.  *See Sanchez v. Secretary of Health and*

15  *Human Services*, 812 F.2d 509, 510 (9th Cir. 1987).  The scope of review requires this Court to

16  consider the record as a whole, examining both the evidence supporting the ALJ's decision and

17  the evidence that does not.

18  **C.    Plaintiff's Claim**

19  Plaintiff contends that the ALJ erred in rejecting the opinion of [Dr. Shireen] Damania,

20  who examined Plaintiff, and accepting the opinion of Dr. Middleton, who did not examine him,

21  with regard to Damania's opinion that Plaintiff's mental impairments limited him the simple one-

22  and two-step instructions.  The agency replies that the ALJ properly assigned little weight to

23  Damania's opinion regarding the severity of Plaintiff's mental impairment since her opinion was

24  inconsistent with both other medical evidence in the record and other portions of Damania's own

25  evaluation.

26  Consideration of Plaintiff's claims would be incomplete without acknowledging that

27  Plaintiff's brief confuses the ALJ's analysis of whether his mental impairment was severe and the

28  *///*

ALJ's analysis of Plaintiff's residual functional capacity.  These separate concepts must be separated and considered individually.

### 1.   Step 2: Severe Impairment?

Contrary to Plaintiff's representation in his briefs, the ALJ compared and considered Damania and Middleton's opinions in the contest of determining whether Plaintiff's mental impairment was severe.  The ALJ found that Plaintiff had no severe mental impairment.

**The ALJ's decision.**  In his second opinion after the Appeals Council's remand, the ALJ again concluded that Plaintiff's only severe impairment was his asthma.  Focusing on the ALJ's analysis of the doctors' opinions is worthwhile.  The ALJ first noted Plaintiff's testimony regarding his depression and "suicidal thoughts which last for 20 to 30 minutes" until Plaintiff can distract himself with a movie or television program.  AR 21.  Although Plaintiff had multiple prescriptions for medications usually considered antidepressants (Xanax, Valium, Wellbutrin, and Elavil), these medications had been prescribed in the course of Plaintiff's withdrawal from methadone and subsequent insomnia.  Since at least December 2003, Plaintiff's medical records made no mention of any mental issues even as the prescriptions had continued.[7]

The ALJ questioned Damania's assessing Plaintiff's global functioning at 55 (indicative of "moderate symptoms or moderate difficulty in functioning") when the narrative of her evaluation stated:

> The claimant was neatly dressed and groomed, pleasant, appropriate, cooperative, with adequate interpersonal and social skills.  No difficulties were noted in memory, either recent or remote, concentration, persistence and pace.  There is no evidence of any emotional lability.  He is able to understand, carry out, and remember simple, as well as one and two step job instructions.  He is able to respond appropriately to co-workers, supervisors, and the public.  He is able to respond appropriately to usual work situations, and deal with changes in a routine work setting, if the instructions are presented simply and unidimensionally.

AR 22.

The ALJ then summarized the balance of Damania's evaluation:

> The mental status examination also showed that the claimant's speech was normoproductive, his mood was only mildly anxious, and his affect was appropriate to though content and situation.  He denied any suicidal or homicidal

---

[7]  Plaintiff himself testified that he took Valium to relieve his back pain.

ideation.  Impulse control and frustration tolerance were within normal limits.
There was no evidence of hallucinations, delusions, or any thought disorder.  He
was oriented to time, place, and person.  Memory for recent and past recall was
intact.  Attention span was within normal limits.  He recalled three out of three
objects in three minutes and was able to do simple calculations.  Insight and
judgment were fair except for alcohol usage, as he indicated he continued to drink
occasionally.

AR 22.

The ALJ then considered Middleton's assessments, alone and in conjunction with agency

psychiatrist Evangeline Murillo, that Plaintiff (1) had only mild limitations in activities of daily

living, maintaining social functioning, and maintaining concentration, persistence and pace, and

(2) failed to demonstrate any medically determinable mental impairment.  AR 22.  In conclusion,

the ALJ rejected Damania's GAF rating of 55, indicative of moderate symptoms or moderate

difficulty in functioning, finding Plaintiff's mental impairment caused no more than mild

limitations in functioning.

Little can be added to the ALJ's step-two analysis; the record includes little evidence of

severe mental impairment.  As the ALJ discussed in detail, Damania's conclusion that Plaintiff's

global functioning was 55, or moderately impaired, contradicted her own factual observations and

was unsupported by the record as a whole.[8]  When carefully considered, Damania's narrative

account of minimal mental impairment was consistent with the assessments of Middleton and

Murillo.  Thus, substantial evidence supported the ALJ's determination to reject the inconsistent

numerical GAF assessment in favor of consistent assessments of Plaintiff's mental impairment as

mild or minimal.

## 2. <u>Step Five: Residual Functional Capacity</u>

Because the ALJ did not consider the medical assessments of Plaintiff's mental

impairments in determining his residual functional capacity at step five, Plaintiff's contention that

the ALJ improperly rejected Damania's opinion that he be limited to positions requiring him to

follow no more than simple one- or two-step instructions is misplaced.  Having concluded that

---

[8]   As the agency points out in its brief (Doc. 18 at 6), the agency explicitly rejected mandating
consideration of the GAF score when it amended regulations regarding mental impairment.  65 Fed. Reg. 50746,
50764-65 (2000).

1  Plaintiff's asthma was his single serious impairment, the ALJ concentrated on limiting Plaintiff's
2  exposure to environmental factors that aggravated his asthma.

3      In the course of his brief analysis at step five, the ALJ notably rejected the conclusory
4  opinion of Plaintiff's treating physician, Dr. Hijazi, that Plaintiff was fully disabled.  He acted
5  correctly.  An ALJ is "not bound by an expert medical opinion on the ultimate question of
6  disability."  *Tomasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008); Social Security Ruling 96-
7  5p.  Although a treating physician's opinion is generally afforded the greatest weight in disability
8  cases, it is not binding on an ALJ with respect to the existence of an impairment or the ultimate
9  determination of disability."  *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001).  The
10 issue of whether a claimant is disabled within the meaning of the Social Security Act is an issue
11 reserved for the Commissioner, and therefore the opinion of a treating physician that a claimant is
12 disabled will not be given special significance.  20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1).

13      **3.    Step Five: Plaintiff's Inability to Follow Complex Instructions**

14      The foregoing discussion sidesteps the substantive question of whether the ALJ failed to
15 consider Damania's opinion that Plaintiff's was unable to follow more than simple one- or two-
16 step instructions.  Substantial evidence in the record, including Plaintiff's having been classified
17 as a special education student and the 1997 testing that indicated his borderline intellectual ability,
18 supports a conclusion of limited intellectual ability.  The ALJ implicitly addressed this question in
19 concluding that the national economy included a significant number of jobs that Plaintiff could
20 perform:

21      If the claimant has solely nonexertional limitations, Section 204.00 in the Medical-
        Vocational Guidelines provides a framework for decisionmaking (SSR 85-15).
22
23      The claimant's ability to perform work at all exertional levels has been
        compromised by nonexertional limitations.  However, these limitations have little
        or no effect on the occupational base of unskilled work at all exertional levels.  A
24      finding of "not disabled" is therefor appropriate under the framework of section
        204.00 in the Medical-Vocational Guidelines.
25
        AR 74.
26
27      Although the Social Security Regulations contain only two categories of abilities in regard
28 to understanding and remembering instructions, either "short and simple" and "detailed" or

14

"complex," the DOT has six gradations for measuring the ability to understand and remember instructions. *Meissl v. Barnhart*, 403 F.Supp.2d 981, 984 (C.D.Cal. 2005).  For example, DOT level 2 requires application of "commonsense understanding to carry out detailed but uninvolved written or oral instructions" and the ability to "[d]eal with problems involving a few concrete variables in or from standardized situations." *Id.* at 984 (*citation omitted*).  Considering claimant Meissl's limitation to "simple tasks performed at a routine or repetitive pace," the Central District Court opined:

> To equate the Social Security regulations use of the term "simple" with its use in
> the DOT would necessarily mean that all jobs with a reasoning level of two or
> higher are encapsulated within the regulations' use of the word "detail."  Such a
> "blunderbuss" approach is not in keeping with the finely calibrated nature in which
> the DOT measures a job's simplicity.

*Meissl*, 403 F.Supp.2d at 984.

Concluding that the claimant's RFC had to be compared to the DOT's reasoning scale, the Meissl court concluded that both DOT reasoning levels one and two encompassed an ability to perform "simple and routine work tasks." *Id.*  Courts within the Ninth Circuit have consistently held that a limitation requiring simple or routine instructions encompasses the reasoning levels of one and two. *See, e.g., Seechan v. Astrue*, 2010 WL 1812637 (E.D.Cal. May 5, 2010)(No. 1:09-cv-00610-GSA); *Villafana v. Astrue*, 2010 WL 1286818 (E.D.Cal. March 29, 2010)(No. 1:08-cv-01954-GSA); *Racette v. Astrue*, 2010 WL 1286786 (E.D.Cal. March 29, 2010)(No. 1:08-cv-01645-GSA); *Stroda v. Astrue*, 2010 WL 129814 (W.D.Wash. January 11, 2010)(No. C09-5112BHS); *Erickson v. Astrue*, 2010 WL 129677 (C.D.Cal. January 5, 2010)(No. EDCV 09-484-OP); *Sorg v. Astrue*, 2009 WL 4885184 (W.D.Wash. December 16, 2009)(No. C09-5063KLS); *Vasquez v. Astrue*, 2009 WL 3672519 (C.D.Cal. October 30, 2009)(No. CV 08-5305-OP); *Moua v. Astrue*, 2009 WL 997104 (E.D.Cal. April 14, 2009)(No. 2:07-cv-02024-GGH); *Angulo v. Astrue*, 2009 WL 817506 (E.D.Cal. March 27, 2009)(No. 1:07-cv-01681-TAG); *Salazar v. Astrue*, 2008 WL 4370056 (C.D.Cal. September 23, 2008)(No. EDCV 07-00565-MAN ); *Isaac v. Astrue*, 2008 WL 2875879 (E.D.Cal. July 24, 2008)(CIV S-07-0442 GGH ); *Squier v. Astrue*, 2008 WL 2537129 (C.D.Cal. June 24, 2008)(No. EDCV 06-1324-RC); *Howard v. Astrue*, 2008 WL 3201221 (C.D.Cal. August 7, 2008) (EDCV 07-1291 RNB).  *See also Stubbs-Danielson v.*

1  *Astrue*, 539 F.3d 1169, 1175-76 (9th Cir. 2008); *Fletcher v. Astrue*, 2010 WL 1644877 (N.D.Tex.

2  March 31, 2010)(No. CIVA509-CV-070-BG);  *Burnette v. Astrue*, 2009 WL 863372 (E.D.N.C.

3  March 24, 2009)(No. 2:08-CV-009-FL).

4        The ALJ here found Plaintiff capable of performing in an unskilled position.  By

5  definition, unskilled positions do not require complex directions or analysis.

6        Unskilled work is work which needs little or no judgment to do simple duties that
         can be learned in a short period of time.  The job may or may not require
7        considerable strength.  For example, we consider jobs unskilled if the primary
         work duties are handling, feeding and offbearing (that is, placing or removing
8        materials from machines that are automatic or operated by others), or machine
         tending, and a person can usually learn to do the job in 30 days, and little specific
9        vocational preparation and judgment are needed.

10       20 C.F.R. § 416.968(a).

11       The ALJ did not err by failing to explicitly discuss Plaintiff's limitation to positions with

12  simple instructions.

13  **III.**    **Conclusion and Order**

14       Based on the foregoing, the Court finds that substantial credible evidence supported the

15  ALJ's determination that Plaintiff was not disabled.  Accordingly, this Court

16  DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social

17  Security.  The Clerk of Court is DIRECTED to enter judgment in favor of the Commissioner and

18  against Plaintiff.

19

20  IT IS SO ORDERED.

21  **Dated:    December 1, 2010**            **/s/ Sandra M. Snyder**
                                     UNITED STATES MAGISTRATE JUDGE
22

23

24

25

26

27

28

16